**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

TIMOTHY BARTON,
CARNEGIE DEVELOPMENT, LLC,
WALL007, LLC,
WALL009, LLC,
WALL010, LLC,
WALL011, LLC,
WALL012, LLC,
WALL016, LLC,
WALL017, LLC,
WALL018, LLC,
WALL019, LLC,
HAOQIANG FU (A/K/A MICHAEL FU),
STEPHEN T. WALL,

Defendants,

DJD LAND PARTNERS, LLC, and
LDG001, LLC,

Relief Defendants.

C.A. No.: 3:22-cv-2118-X

Jury Trial Demanded

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S EXPEDITED MOTION <u>FOR APPOINTMENT OF RECEIVER AND BRIEF IN SUPPORT</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iii-iv

FEDERAL STATUES .......... v

I. INTRODUCTION .......... 1

II. RECEIVERSHIP DEFENDANTS .......... 2

III. FACTUAL SUMMARY .......... 4

A. The Wall Offerings .......... 4

B. The Barton Defendants Defrauded the Investors .......... 6

1. Misappropriation of investor funds .......... 6

2. Inflation of property purchase prices .......... 8

3. Worthless guarantee .......... 10

4. Lulling statements .......... 11

IV. ARGUMENT AND AUTHORITIES .......... 11

A. Legal Standard for Appointment of Receiver .......... 11

B. Prima Facie Showing of Antifraud Violations .......... 14

C. The Appointment of a Receiver is Warranted .......... 18

V. REQUEST FOR EXPEDITED CONSIDERATION .......... 20

VI. REQUEST FOR RELIEF .......... 20

## TABLE OF AUTHORITIES

### Federal Cases

*Aaron v. SEC*,
446 U.S. 680 (2d Cir. 1980) .......... 15

*Bookout v. Atlas Fin. Corp.*,
395 F. Supp. 1338 (N.D. Ga. 1974) .......... 13

*Broad v. Rockwell, Int'l Corp.*,
642 F.2d 929 (5th Cir. 1981) (en banc) .......... 15

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (7th Cir. 1976) .......... 15

*Esbitt v. Dutch-American Mercantile Corp.*,
335 F.2d 141 (2d Cir. 1964) .......... 12

*SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*
2009 WL 3233110 (E.D.N.Y. Oct. 2, 2009) .......... 14

*Lockyer v. Mirant Corp.*,
398 F.3d 1098 (9th Cir. 2005) .......... 14

*SEC v. American Bd. of Trade, Inc.*,
830 F.2d 431 (2d Cir. 1987) .......... 12

*SEC v. AmeriFirst Funding, Inc.,*
2007 WL 2192632 (N.D. Tex. July 31, 2007) .......... 11, 12, 13

*SEC v. Better Life Club of American, Inc.*,
995 F. Supp. 167 (D.D.C. 1998) .......... 16

*SEC v. Brooks,*
1999 WL 493052 (N.D. Tex. July 12, 1999) .......... 17

*SEC v. Evolution Cap. Advisors, LLC,*
2011 WL 6754070 (S.D. Tex. Dec. 22, 2011) .......... 13

*SEC v. Fehn*
97 F.3d 1276 (9th Cir. 1996) .......... 15

*SEC v. First Fin. Grp. of Texas*,
645 F.2d 429 (5th Cir. 1981) .......... 12, 13, 14, 18

*SEC v. Gann*,
565 F.3d 932 (5th Cir. 2009) .......... 14

*SEC v. Glenn W. Turner Enterprises, Inc.*,
474 F.2d 476 (9th Cir. 1973) .......... 16

*SEC v. Harris,*
2010 WL 11617972 (N.D. Tex. June 24, 2010) ........ 12

*SEC v. Manor Nursing Ctrs., Inc.*,
458 F.2d 1082, 1089 (2d Cir. 1972) ........ 11, 12, 15

*SEC v. Seghers*,
298 F. App'x 318, 319 (5th Cir. 2008) ........ 14

*SEC v. Sethi*,
910 F.3d 198 (5th Cir. 2018) ........ 15

*SEC v. Smart,*
2011 WL 2297659 (D. Utah June 8, 2011) ........ 16

*SEC v. Straub,*
921 F.Supp.2d 244 (S.D.N.Y. 2013) ........ 14

*SEC v. Tyler,*
2002 WL 32538418 at *7 (N.D. Tex. Feb. 21, 2002) ........ 14, 16

*SEC v. Unifund SAL*,
910 F.2d 1028 (2d Cir. 1990) ........ 12

*SEC v. W.J. Howey Co.,*
328 U.S. 293–99 (1946) ........ 16

*Smith v. SEC*,
653 F.3d 121 (2d Cir. 2011) ........ 13

*Southland Sec. Corp. v. INSpire Ins. Solution, Inc.*,
365 F.3d 353 (5th Cir. 2004) ........ 15

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (7th Cir. 1976) ........ 15

**<u>Federal Statutes</u>**

<u>Securities Exchange Act of 1934:</u>

Section 10(b),
[15 U.S.C. § 78j(b)] ....................................................................................................14

Section 21,
[15 U.S.C. § 78u] ........................................................................................................ 12

Rule 10b-5,
[17 C.F.R. § 240.10b-5]...............................................................................................14

<u>Securities Act of 1933:</u>

Section 2(a)(1),
[15 U.S.C. § 77b(a)(1)]...............................................................................................16

Section 3(a)(10),
15 U.S.C. § 78c(a)(10)................................................................................................16

Section 17(a),
[15 U.S.C. § 77q(a)] .................................................................................................. 14

The Securities and Exchange Commission ("SEC") submits this Expedited Motion for Appointment of Receiver and Brief in Support, and respectfully shows the Court as follows:

## I. INTRODUCTION

Timothy Barton ("Barton"), a Texas-based real estate developer, raised approximately $26 million from over 100 investors -- most of whom are Chinese nationals -- in unregistered, fraudulent securities offerings related to real-estate investments in Texas.[1]

Barton offered and sold investment loans issued by a series of special-purpose "Wall" entities he controls. Barton promised that the Wall entities would use investors' funds, together with funds from the Wall entities themselves, to purchase specific parcels of land at specific prices set forth in the offering materials. He also promised investors that they would get their principal back in two years along with annual interest payments.

Instead, Barton misappropriated nearly all the investor funds, misusing them to, among other things, purchase properties in the name of other entities he controlled, pay undisclosed fees and commissions, pay expenses associated with unrelated real estate development projects, and fund his lifestyle. Barton also inflated the land purchase prices in the offering materials, which enabled him to raise more money from investors, overstated the value of the assets securing the investments, and concealed that the Wall entities were not actually contributing any funds themselves.

Among his misappropriations, Barton, acting through various entities he controls, misused a significant portion of the investor funds to purchase real property interests, including

[1] To implement the scheme, Barton partnered with Defendants Stephen Wall ("Wall"), an experienced Texas home builder, and Haoqiang (Michael) Fu ("Fu"), a Chinese businessman. Because the SEC is only seeking a receiver over the Barton-controlled entities, this Motion does not directly address Fu's and Wall's role in the fraud. At a high level, and among other acts, Fu marketed the investments to Chinese investors and misused investor funds to pay himself undisclosed fees and commissions, and Wall lent his name to the project and helped to provide the inflated land prices.

several parcels of raw land in Texas. *See* Declaration of Carol Hahn ("Hahn Dec.") at ¶¶ 33-26 & Ex. B.[2] (App. 14 & 17) The property interests could potentially result in a meaningful recovery for investors. However, there is a substantial risk to the value of the property interests if a steward is not put in place to protect them.

For these reasons, the SEC respectfully requests the Court to appoint a receiver over the Barton-controlled entities to determine the value of the property interests (and any other assets) and to secure, preserve, and potentially monetize that value for the benefit of defrauded investors. The evidence provided in support of this Motion provides a basis for inferring that a violation of the federal securities laws has occurred, and thus satisfies the SEC's burden for obtaining the requested ancillary relief. As discussed at Section IV.C below, the SEC has proposed a receiver candidate for the Court's consideration.

On September 20, 2022, the U.S. Attorney's Office for the Northern District of Texas indicted Barton on seven counts of wire fraud, one count of conspiracy to commit wire fraud, and one count of securities fraud relating to his misconduct in connection with the investments at issue. *See USA v. Barton*, Case No. 3-22-cr-00352-K (N.D. Tex).

As demonstrated herein, Barton has been commingling, transferring, dissipating, and encumbering investor funds and assets purchased with investor funds. The SEC therefore believes time is of the essence, and requests that its motion be considered on an expedited basis.

## II. RECEIVERSHIP DEFENDANTS

The SEC is seeking appointment of a receiver for the purpose of marshaling and preserving the assets owned, controlled, or possessed by the following Barton-controlled entities (collectively, "Receivership Defendants"):

---

[2] The SEC's evidence is set forth in its contemporaneously filed appendix in support of this Motion ("App. __").

- Defendants Wall007, LLC ("Wall 7"), Wall009, LLC ("Wall 9"), Wall010, LLC ("Wall 10"), Wall011, LLC ("Wall 11"), Wall012, LLC ("Wall 12"), Wall016, LLC ("Wall 16"), Wall017, LLC ("Wall 17"), Wall018, LLC ("Wall 18"), and Wall019, LLC ("Wall 19") (each a "Wall Entity," and collectively, "Wall Entities"). The "Wall Entities" are the special-purpose entities that offered the investment loans.[3]

- Defendant Carnegie Development, LLC ("Carnegie Development"). Barton controls Carnegie Development and is its president. Carnegie Development is the managing member for each of the Wall Entities, and Barton signed the loan agreements at issue on behalf of Carnegie Development. Barton, Carnegie Development, and the Wall Entities are referred to herein as the "Barton Defendants."

- Relief Defendants DJD Land Partners, LLC ("DJD") and LDG001, LLC ("LDG001"). DJD and LDG001 are additional Barton controlled-entities that improperly received interests in real property purchased with investor funds or the proceeds of the sale of property purchased with investor funds.

- Any other entities that Barton directly or indirectly controls, including, but not limited to, the following additional Barton-controlled entities that, based on available information, received investor funds, real property interests purchased with investor funds, or own property interests that were improved with or otherwise have benefited from the use of investor funds: BM318 LLC; D4DS LLC; D4FR LLC; D4KL LLC; Enoch Investments LLC; FHC Acquisition LLC; Goldmark Hospitality LLC; JMJ Acquisitions LLC; JMJ Development

---

[3] Barton recently filed voluntary petitions for Chapter 11 for all of the Wall Entities. As discussed in the legal section below, pursuant to the government exception to the automatic stay, the SEC is not stayed from proceeding with its enforcement action against those entities and they can be included in the receivership. The bankruptcy cases are: *In re WALL007 LLC, et al.,* No. 22-41049 (Bankr. E.D. Tex.).

LLC; JMJAV LLC; JMR100 LLC; Lajolla Construction Management LLC; Mansions Apartment Homes at Marine Creek LLC; MO 2999TC, LLC; Orchard Farms Village LLC; Villita Towers LLC; and 126 Villita LLC. *See* Hahn Dec. at ¶ 37 & Ex. C.[4] (App. 15 & 18)

## III. FACTUAL SUMMARY

### A. The Wall Offerings.

Barton is a Texas-based real estate developer that controls the Barton Defendants, DJD, LDG001, and several other related entities. *See* May 24, 2021 Investigative Testimony of Timothy Barton ("Barton Tr.") at 172:3-173:2; 173:19-174:5; 192:8-193:24; 200:17-22; 236:8-16 (App. 231-233; 240-243); List of Barton-Controlled Entities. (App. 23-24)

From approximately March 2017 through June 2019, Barton, acting through Carnegie Development and the Wall Entities, raised approximately $26 million from over 100 investors in securities offerings related to real estate investments in Texas. *See* Hahn Dec. at ¶ 14. (App. 6)

The investments were offered through a series of investment contracts styled as "Agency and Loan Agreements" ("Loan Agreements") that each Wall Entity issued as the offering entity. *See e.g.,* Wall 9 Loan Agreement at 1 (App. 25); Wall 12 Loan Agreement at 1. (App. 49)

Though dealing with separate parcels of land, the Loan Agreements followed a similar template and contained similar terms. Each Wall Entity:

- borrowed a fixed amount from individual investors;
- promised to repay the funds after two years;
- promised to pay interest after the first and second years;

[4] Barton controls multiple other entities that may have also received or benefited from investor funds. Barton's counsel provided the SEC with a list of Barton-controlled entities. *See* List of Barton-Controlled Entities (App. 23-24). However, without full access to Barton's records, and as a result of his extensive comingling and transferring of properties and funds, the SEC has been unable confirm all of the entities Barton controls and their assets. Hahn Dec. at ¶ 37. (App. 15)

- promised regular progress reports;
- represented that the invested funds would be combined with other investors' funds and funds contributed by the offering entity itself (or, for Wall 7, contributed by Fu and Wall);
- the combined funds would be used to acquire a specific parcel of land identified in the loan agreement;
- specified the purchase price of the land; and
- pledged the Wall Entities' membership interests as collateral to secure the investments.

*See e.g.,* Wall 9 Loan Agreement at 1-7. (App. 25-31)

Barton developed, authorized, and approved the contents of the Loan Agreements, and he signed the Loan Agreements on behalf of Carnegie Development, the managing member of each of the Wall Entities. *Id.* at 8 (App. 32)*; see also* August 27, 2017 Loan Agreement Approval Email at 1 (App. 143); July 20, 2021 Investigative Testimony of Haoqiang (Michael) Fu ("Fu Tr.") at 153:9-12. (App. 263).

Fu, acting directly or through personnel at his company, solicited Chinese investors living in China and in one or more U.S. states via emails, social media applications (*e.g.*, "WeChat"), internet sites, telephone and VOIP calls, and in-person presentations using the Loan Agreements, written investor presentations, and oral pitches. *See e.g.,* Wall 10 Investor Presentation (with English translation) (App. 66-109); Wall 12 Investor Presentation (Chinese only) (App. 110-142); Fu Tr. at 30:1-14; 30:25-31:15; 139:15-24; 153:17-19; 157:14-158:18. (App. 260-265)

Investors invested money to obtain a fixed investment return, and their funds were pooled with other investors' funds (and were also supposed to be pooled with funds from the Wall Entities). *See, e.g.* Wall 9 Loan Agreement at 1-2 (App. 25-26); Hahn Dec. at ¶ 15. (App. 6-7)

These were entirely passive investments: the investors had no role or say in the operations or management of the Wall Entitles or the underlying real-estate projects, and the

investors were entirely dependent upon, and expecting to profit solely from, the Barton Defendants' and Wall's expertise and efforts to manage the real-estate ventures. *See, e.g.,* January 25, 2021 Investigative Transcript of Stephen Wall ("Wall Tr.") at 53:19-54:14 (App. 271-272); Barton Tr. at 294:3-296:17. (App. 247-249)

**B. The Barton Defendants Defrauded the Investors.**

**1. Misappropriation of investor funds.**

Each of the Loan Agreements represented that *all* investor funds would be used to buy a specific, identified piece of land. For example, the Wall 12 Loan Agreement represented that the investor funds:

> **shall be used to acquire 172 acres located in Fort Worth ETJ, Parker County, State of Texas for residential lot development known as Lyons Ranch ("Property")**. The Property has a purchase price of $5,250,000 and the balance of funds will be provided by Borrower. (emphasis added)

Wall 12 Loan Agreement at 2 (App. 50); *see also* March 9, 2022 Investigative Testimony of investor Hong Chen ("Chen Tr.") at 36:2-38-1 (App. 285-287); March 15, 2022 Investigative Testimony of investor Sun Yun ("Yun Tr.") at 5:25-6:13; 23:10-24:6; 26:7-25; 30:22-31-7. (App. 299-305)

These representations were false. Of the approximately $26.3 million raised, only two Wall Entities (Wall 7 and Wall 9) actually purchased the property described in their agreements for a total purchase price of approximately $2.6 million. Hahn Dec. at ¶ 17. (App. 7)

Even in those two limited instances, neither Wall 7 nor Wall 9 used its own investors' funds to purchase its property, and instead used commingled funds from one or more other offerings. *Id.* (App. 7) None of the other Wall Entities acquired the properties described in their respective agreements. *Id.* at ¶ 22. (App. 9)

Instead, Barton misappropriated and misused the remaining approximately $23.7 million of investor funds to, among other things:

- pay personal expenses of Barton and his family, including exorbitant credit card bills, rent, and to buy a plane;
- pay Fu undisclosed and unauthorized commissions and fees;
- make Ponzi payments to earlier investors (as well as other interest payments to investors using commingled funds);
- to make political contributions;
- acquire properties not related to the offerings in the names of other Barton companies;
- acquire properties identified in a Wall offering but in the name of other Barton companies (including LDG001 and DJD) and using funds from a different Wall Entity;[5]
- pay professional fees (such as engineering, surveying, and land development) for, in most cases, properties unrelated to the offerings; and
- make payments to Wall.

Hahn Dec. at ¶¶ 22-27 (App. 9-11); *see also* Barton Tr. at 345:7-14; 346:4-11; 349:1-350:17; 357:8-24. (App. 250-254)

Barton controlled the bank accounts for the Wall Entities and Carnegie Development, and he had signatory authority over most of the accounts. Hahn Dec. at ¶ 12 (App. 5-6); *see also* Barton Tr. at 178:2-12; 181:2-6; 187:12-190:20 (App. 234-239); Fu Tr. at 192:4-18. (App. 266) Barton often directed his administrative assistant to make the improper transfers. *See* Barton Tr. at 178:2-12 (App. 234); March 10, 2022 Investigative Testimony of Saskya Bedoya ("Bedoya

[5] LDG001 used commingled investor funds to purchase the property that the Wall 18 Loan Agreement stated Wall 18 was supposed to purchase, and DJD used the proceeds of a partial sale of a property purchased with investor funds to purchase the property that the Wall 11 Loan Agreement stated Wall 11 was supposed to purchase. Hahn Dec. at ¶¶ 23-24. (App. 9) Upon information and belief, LDG001 and DJD continue to hold these properties purchased with investor proceeds. *Id.* at ¶ 33 and Ex. B (App. 14 & 17).

Tr.") at 129:14-130:20 (App. 277-278); June 27, 2017, November 15, 2017, and January 9, 2019 Examples of Barton Payment Instruction Emails. (App. 152-155)

Barton also took out loans on properties acquired with investor funds, and he used the loan proceeds (which were also commingled with investor funds) to, among other things, purchase other properties, support his businesses, and fund his lifestyle. Hahn Dec. at ¶ 29-30. (App. 12-13)

Despite promising to make annual interest payments and to return investors' principal, the Barton Defendants never returned any of the principal to investors as promised, and failed to pay over 80% of the promised interest payments. Hahn Dec. at ¶ 28. (App. 11-12)

Barton knew how investor funds were required to be used, because he was responsible for developing the Loan Agreements, he received copies of Loan Agreements, and he was a signatory to the Loan Agreements. Supra at 5. Barton knew the investor funds were being misused and misappropriated, because he controlled the bank accounts and caused the funds to be transferred and spent for improper purposes. Supra at 7-8.

**2. Inflation of property purchase prices.**

The Loan Agreements represented that the Wall Entity would purchase a specific parcel of land with the investor funds, and represented that the offering entity would also contribute money to fund the purchase.

For example, the Wall 9 Loan Agreement had a total offering amount of $2,320,000. It represented that the purchase price for the property was $2,900,000, and the offering entity would fund the difference between the offering amount and the purchase price:

> [The Loans] shall be used to acquire 100 acres located in Venus, Texas for residential lot development known as Venus 100 located on Country Rd 501 and West of FM157 in Venus, Texas ("Property"). **The Property has a purchase**

**price of $2,900,000 and the balance of funds will be provided by Borrower**. (emphasis added)

Wall 9 Loan Agreement at 2. (App. 26)

The representations about the purchase prices were also false. The disclosed purchase prices were inflated. At the time of the offerings, the Barton Defendants had already secured, or were in the process of negotiating, purchase prices for the properties that were significantly lower than the prices set forth in the Loan Agreements. Hahn Dec. at ¶¶ 31-32. (App. 13-14)

For example, Wall 10 issued a Loan Agreement on October 18, 2017 that set a land purchase price of $4,400,000. Wall 10 Loan Agreement at 2. (App. 34) However, Barton had already executed a contract months earlier to purchase the Wall 10 property for $2,200,000. *See* May 2, 2017 Lost Creek Price Email at 1 (App. 157); Lost Creek Land Sale Contract at 1 and 13 (App. 195 & 207).[6]

As another example, Wall 11 issued a Loan Agreement on February 7, 2018 that set a land purchase price of $2,950,000. *See* Wall 11 Loan Agreement at 2. (App. 42). Yet, Barton had already executed a contract months earlier to purchase the Wall 11 property for $1,577,125. *See* Anastasia Land Sale Contract at 1 and 8 (App. 219 & 226).

Barton knew that the inflated purchase prices were being provided to investors, because he and Fu and Wall secretly agreed to inflate the prices. *See* August 29, 2016 Wall to Barton Markup Email at 1 (App. 160); February 28, 2019 Wall to Fu and Barton Markup Email at 1 (App. 176); November 3, 2016 Fu to Wall Markup Email (forwarded to Barton) at 1-4. (App. 177-179). Further, as discussed above, he was involved in underlying purchase negotiations (or

[6] The Wall 9 property purchase price referenced in the previous paragraph was also inflated. The actual purchase price was approximately $1,014,900. *See* Hahn Dec. at ¶ 32. (App. 13)

received details on the purchase transactions) setting the real prices, and he executed the Loan Agreements containing the inflated prices.

By overstating the purchase prices, Barton could use the inflated prices to raise more funds from investors in each offering. The inflated purchase prices also created the false appearance that the investments were safer than they were. The Loan Agreements pledged the Wall Entities' membership interests to secure the investment. *See, e.g.* Wall 9 Loan Agreement at 6. (App. 30) Barton was leading investors to believe that the Wall Entities were obtaining properties at the higher prices that could be sold to pay back investors via their share of the membership interests if necessary, when in fact the properties, and thus the Wall Entities, had far lower values.

The representations about the contributions of the Wall Entities' funds were also false. Neither the Wall Entities nor any of the other Defendants contributed funds towards the purchase of the properties. Hahn Dec. at ¶ 31. (App. 13) The inflation of the purchase prices was used to mask this misrepresentation. Indeed, in the two instances where the Wall Entities actually purchased their specified properties, no developer contribution was necessary to pay the balance of the difference between the offering amount and the purchase price, because the actual purchase price was lower than the offering amount. Hahn Dec. at ¶¶ 17, 32. (App. 7 & 13-14)

**3. Worthless guarantee.**

The Loan Agreements for many of the offerings also included a purported corporate guarantee by one of Barton's other entities, JMJ Holdings, for "up to the principal loan amount in the event of default." *See, e.g.,* Wall 10 Loan Agreement at 6 (App. 38); Wall 12 Loan Agreement at 6. (App. 54)

Barton approved the guarantees after learning that certain Chinese investors considered them to be an important consideration for their investment decision. *See* January 23, 2019 Barton Guarantee Email at 1. (App. 181) Barton also executed a balance sheet purportedly showing that JMJ Holdings had total assets of more than $100 million. *See, e.g.,* Wall 10 Investor Presentation at 27 (App. 92); Wall 12 Investor Presentation at 19 (App. 128); Chen Tr. at 48:16-49:24. (App. 288-289)

The purported guarantees were simply more deception. In reality, JMJ Holdings is a dormant company that has never done any business or had any assets. Barton Tr. at 252:22-253:18; 254:1-24. (App. 244-246)

**4. Lulling statements**

The Loan Agreements required the Wall Entities to provide investors with quarterly progress reports about the status of the relevant real estate development. One of Barton's other controlled entities, JMJ Development, acting on behalf of the Wall Entities, sent investors progress reports that misrepresented the actual status of the projects.

For example, a fourth quarter 2019 update sent to investors stated that "all of [the Wall Entities] appear to be tracking with the initial … development plans." 2019 Q4 Lender Update at 2 (App. 184); *see also* Yun Tr. at 33:7-16; 34:20-35:7; 36:4-14. (App. 306-309) Yet, most of the properties were never actually acquired by a Wall Entity, much less developed as planned.

## IV. ARGUMENT AND AUTHORITIES

### A. Legal Standard for Appointment of Receiver.

Federal courts have broad equitable powers to fashion appropriate ancillary remedies necessary to grant full relief. *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103-4 (2d Cir. 1972); *SEC v. AmeriFirst Funding, Inc.*, No. 3:07-CV-1188-D, 2007 WL 2192632, at *3

(N.D. Tex. July 31, 2007). Exchange Act Section 21(d)(5) provides: "[i]n any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5).

The SEC's burden for ancillary relief is *lower* than what it must prove to obtain a temporary restraining order. *See SEC v. Harris,* No. 3:09-CV-1809-B, 2010 WL 11617972, at *3 (N.D. Tex. June 24, 2010) ("The Commission's burden is lower with regards to an asset freeze, receivership and other ancillary relief than with a traditional injunction."); *SEC v. Unifund SAL,* 910 F.2d 1028, 1041 (2d. Cir. 1990) ("[A]n ancillary remedy may be granted, even in circumstances where the elements to support a traditional SEC injunction have not been established[.]"). The SEC establishes that ancillary relief is warranted by providing a basis for inferring a violation of the federal securities laws. *See, e.g.*, *Harris,* 2010 WL 11617972, at *3.

The appointment of a receiver is a well-established form of ancillary relief in SEC enforcement actions. *SEC v. First Fin. Grp. of Texas*, 645 F.2d 429, 438 (5th Cir. 1981) ("The appointment of a receiver is a well-established equitable remedy available to the SEC in its civil enforcement proceedings for injunctive relief."); *AmeriFirst Funding*, 2007 WL 2192632, at *3.

Courts will appoint a receiver to, among other protective actions, protect injured investors from further despoliation of their property or rights; preserve the status quo while transactions are being unraveled in order to determine an accurate picture of the fraudulent conduct; and/or marshal and prevent the dissipation of a defendant's assets pending further action by the court. *First Fin. Grp.*, 645 F.2d at 438; *SEC v. American Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987); *Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir. 1964).

The Court may appoint a receiver on a prima facie showing of fraud and mismanagement. *See First Fin. Grp.*, 645 F.2d at 438; *see also SEC v. Evolution Cap. Advisors, LLC,* No. H-11-2945, 2011 WL 6754070, at *5 (S.D. Tex. Dec. 22, 2011) ("In fact, upon a showing of fraud and mismanagement, appointment of a receiver 'becomes a necessary implementation of injunctive relief.'") (citing *First Financial Group*); *Amerifirst Funding,* 2007 WL 2192632, at *3 (same).

An evidentiary hearing is not required on the SEC's request to appoint a receiver where the record discloses sufficient facts to warrant such an appointment. *See Bookout v. Atlas Fin. Corp.*, 395 F. Supp. 1338, 1342 (N.D. Ga. 1974), *aff'd*, 514 F.2d 757 (5th Cir. 1975).

Ancillary relief may also be properly directed to non-defendant parties who hold assets on a defendant's behalf. *See, e.g., Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) ("The plenary powers of a federal court to order an asset freeze are not limited to assets held solely by an alleged wrongdoer, who is sued as a defendant in an enforcement action. Rather, '[f]ederal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten gains; and (2) does not have a legitimate claim to those funds.'") (citation omitted).

In addition, the SEC is not stayed from proceeding with an enforcement action against the Wall Entities that are currently in bankruptcy, or any of the other subject entities who may subsequently file for bankruptcy. Section 364(b)(2) of the Bankruptcy Code allows the SEC to initiate or continue an enforcement action against a debtor in bankruptcy. 11 U.S.C. § 362(b)(4).

This governmental exception to the automatic stay further allows the SEC to take action to obtain possession or control of bankruptcy estate property, including the appointment of a receiver. *First Fin. Grp.*, 645 F.2d at 439 (upholding the appointment of a receiver to take

control of the debtor's assets to safeguard the estate from dismemberment and dissipation of assets); *see also SEC v. Tyler*, No. 3:02-CV-0282, 2002 WL 32538418 at *7 (N.D. Tex. Feb. 21, 2002) (same).[7] Accordingly, while the SEC is stayed from enforcing a money judgment against estate property as a collection measure, seeking a receiver and corporate manager to take control and possession of estate property properly falls within the scope of Section 362(b)(4).

**B. Prima Facie Showing of Antifraud Violations.**

The Commission alleges that the Barton Defendants violated the antifraud provisions of the Securities Act and the Exchange Act. Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] prohibits fraud in the offer or sale of a security, and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] prohibit fraud in connection with the purchase or sale of any security.

To establish a violation under these sections, the Commission must prove by a preponderance of the evidence: (1) that in connection with the purchase, offer, or sale of any security; (2) the Barton Defendants made a material misrepresentation or omission of material fact, or employed a fraudulent device; (3) with the requisite mental state. *See generally*, *SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009); *SEC v. Seghers*, 298 F. App'x 319, 327-28 (5th Cir. 2008).[8]

[7] This Court has jurisdiction to determine whether the automatic applies to a motion for receivership. *First Fin. Grp.*, 645 F.2d at 439 (the district court has the jurisdiction to determine whether the SEC's civil enforcement action comes within the § 362(b)(4) exception to the automatic stay); *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1107 (9th Cir. 2005) ("We therefore hold, in accordance with established law, that a district court has jurisdiction to decide whether the automatic stay applies to a proceeding pending before it, over which it would otherwise have jurisdiction.").

[8] Both statutes require that securities be offered or sold through the use of interstate communications, commerce, or the mails. The Loan Agreements were offered and sold using wires, emails, phone calls, and internet applications. Supra at 5; Hahn Dec. at ¶ 15 (App. 6); *see also SEC v. Straub*, 921 F.Supp.2d 244, 262 (S.D.N.Y. 2013) ("[I]t is undisputed that the use of the internet is an 'instrumentality of interstate commerce"); *SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*, No. 08CV1402, 2009 WL 3233110, at *4 (E.D.N.Y. Oct. 2, 2009) (holding that wire transfers were instrumentalities of interstate commerce).

Liability arises not only from affirmative representations but also from failures to disclose material information. *See SEC v. Fehn* 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (the antifraud provisions impose a "duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.").

Establishing a violation of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 requires proof of scienter. *See Aaron v. SEC*, 446 U.S. 680, 695-97 (1980). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976). To prove scienter, the SEC need only show the defendant acted with "severe recklessness." *SEC v. Sethi,* 910 F.3d 198, 206 (5th Cir. 2018) (citing *Broad v. Rockwell, Int'l Corp.,* 642 F.2d 929, 961 (5th Cir. 1981) (en banc).[9] Negligence is sufficient to show a violation of Sections 17(a)(2) and (3) of the Securities Act. *See Aaron*, 446 U.S. at 701-02.

To establish violations of Sections 17(a) and 10(b) and Rule 10b-5 based on misrepresentations or omissions, the facts at issue must be material. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). A misstatement or omission is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Id; SEC v. Seghers*, 298 F. App'x 318, 328 (5th Cir. 2008).

The evidence set forth in support of the SEC's motion more than makes a prima facie showing of the Barton Defendants' violations of these fraud-based claims:

*First*, the Barton Defendants offered and sold securities. Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include, among other

[9] A company's scienter can be imputed from individuals who control it. *See Manor Nursing Ctrs., Inc.,* 458 F.2d at 1089, n.3; *Southland Sec. Corp. v. INSpire Ins. Solution, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).

instruments, any "investment contract" or "note." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10).

The Loan Agreements are "investment contracts."[10] The investors invested money that was pooled in a common enterprise with the expectation of investment returns based and dependent solely on the efforts of the promoters. Supra at 5-6; *see also SEC v. Better Life Club of American, Inc.*, 995 F. Supp. 167, 173-174 (D.D.C. 1998), *aff'd* 203 F.3d 54 (D.C. Cir. 1999) (holding loan agreements in which investors contributed funds to common enterprise with expectation of receiving profits based solely on the efforts of the promoters were securities, and finding it "hard to imagine a more perfect example" of an "investment contract").

The Loan Agreements are also securities, because they are "notes." "The Supreme Court has held that the definition of 'note' may 'be viewed as a relatively broad term that encompasses instruments with widely varying characteristics,' and as with the term 'security,' the definition of 'note' looks to the economic reality and surrounding circumstances of a transaction." *Tyler*, 2002 WL 32538418 at *7 (internal citation omitted). Here, the Loan Agreements evidence a promise to pay a financial return on set terms and are notes in economic substance. *See Tyler*, 2002 WL 32538418 at *7 (holding letters outlining maturity date and annual rate of return for viaticals investment were both notes and investment contracts); *SEC v. Smart*, Civ. No. 2:09-CV-00224, 2011 WL 2297659, at 12-14 (D. Utah June 8, 2011) (note agreements that pooled investor funds and promised fixed returns were securities as either investment contracts or notes). The subscription agreements provided to several investors also represented the investment was a note. *See, e.g.,* Wall 19 Subscription Agreement at 1 ("I hereby subscribe to the Note (promissory note) as co-lender.") (App. 57).

[10] An investment contract exists where: (1) individuals are led to invest money; (2) in a common enterprise; and (3) with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves. *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99 (1946). Courts do not take the word "solely" literally. *See, e.g.*, *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973).

*Second*, the Barton Defendants made material misstatements and omissions and engaged in deceptive acts in connection with the offer, purchase, and sale of the securities:

- The Barton Defendants falsely told investors the Wall Entities would use their money to purchase a specific parcel of land, but then misappropriated the money and spent it on a litany of improper purposes. A reasonable investor would consider the fact that their investment would not be used for the represented investment purpose important in deciding whether to invest. *SEC v. Brooks*, No. 3:99-cv-1326-D, 1999 WL 493052 at *2 (N.D. Tex. July 12, 1999) (misrepresentations about use of investor funds are material); *see also* Chen Tr. at 36:2-38-1 (App. 285-287); Yun Tr. at 23:10-24:6; 26:7-25. (App. 301-303)
- The Barton Defendants misstated the land purchase prices. A reasonable investor would consider the fact that the promoter was intentionally inflating the value of the collateral securing their investments important in deciding whether to invest.
- The Barton Defendants falsely told the investors that the Wall Entities would be contributing funds towards the land purchases. A reasonable investor would consider the fact that promoter was lying about putting its own money into a venture side-by-side with the investors important in deciding whether to invest. *See e.g.,* Chen Tr. at 63:5-64:21; 65:8-12. (App. 290-292).
- The Barton Defendants claimed to certain investors that their investments were fully guaranteed by one of Barton's other companies, but omitted that the guaranteeing company had no assets. A reasonable investor would consider the fact that he or she was receiving a worthless guarantee important in deciding whether to invest.

*Third*, Barton acted with scienter. Barton knew how investor funds were required to be used, because he was responsible for developing the Loan Agreements and he was a signatory to the Loan Agreements. Barton knew the investor funds were being misused, because he controlled the bank accounts and caused the funds to be transferred and spent for improper purposes. Barton also knew the inflated purchase prices were being provided to investors, because he agreed to the scheme with Fu and Wall, he was involved in underlying purchase negotiations setting the actual prices, and he executed the Loan Agreements containing the inflated prices. Finally, Barton knew that the company he was using to guarantee the investments had no assets.[11]

**C. The Appointment of a Receiver is Warranted.**

"The district court's exercise of its equity power in this respect is particularly necessary in instances in which the corporate defendant, through its management, has defrauded members of the investing public; in such cases, it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of those who were induced to invest in the corporate scheme and for whose benefit, in some measure, the SEC injunctive action was brought." *First Fin. Grp. of Texas*, 645 F.2d at 438 (citations and footnotes omitted).

A receivership is warranted here given the Barton Defendants' fraud and the resulting harm to investors. Barton mismanaged and misused substantially all of the investor proceeds. Appointing a receiver for the all of the entities, including those currently in bankruptcy, will provide for uniformity in administration of all entities by a single fiduciary who is subject to the

[11] The evidence of scienter here is overwhelming. However, the SEC's antifraud claims under Section 17(a)(2) and (3) of the Securities Act only require a showing of negligence. There is no question that Barton did not exercise reasonable care in his use of investor funds and in making the other misstatements and omissions.

supervision and jurisdiction of this Court. Further, a receiver is critical here to determine how and whether the bankruptcy cases should proceed, the most cost effective way of utilizing the bankruptcy cases, and how best to maximize asset recovery for all defrauded investors. Consequently, appointment of a receiver over the entities, including those in Chapter 11, is necessary to protect investors.

As noted above, Barton, acting through various entities that he directly or indirectly controls, misused a significant portion of the investor funds to purchase real property interests, including several parcels of raw land. Barton, who has now been indicted on multiple felony counts, has previously encumbered and transferred assets. There is a substantial risk that the values of the real property assets will not be maximized or worse, will be further degraded, if a receiver is not put in place immediately to steward the assets.

The receivership will seek to efficiently and expeditiously gather, manage, and potentially liquidate receivership assets for the benefit of harmed investors. In the immediate term, the receivership would focus on determining the value of the real property interests and any other assets, determining what (if anything) can be done to secure and preserve that value, and taking steps to protect documents, data, technology, and other sources of information. Thereafter, the receivership would focus on monetizing any value in the real property interests or other identified assets.

Longer term, the receivership will also focus on: (1) tracing of funds; (2) asset recovery; and (3) evaluation and prosecution of potential litigation. Generally, claims may exist against persons or entities that directly or indirectly received property or other assets from a Receivership Defendant. Claims may also exist against persons or entities that directly or indirectly were involved in the solicitation of funds which were paid to Receivership Defendants.

The SEC has vetted candidates to make a recommendation to the Court, identifying receiver candidates who: (i) possess skill and experience in this area; (ii) agree to standard billing and reporting requirements; (iii) agree to reduce professional fees; (iv) have personnel poised for immediate action; and (v) have cleared conflicts.

In that regard, submitted herewith is a biography for David Wallace (Trigild, Inc.) for the Court's consideration. (App. 312). Wallace presents significant benefits as a receivership candidate for this matter. First, Wallace has agreed to obtain the title work and broker's opinions of value for the properties at no cost to the receivership. These are expected to be the primary costs incurred to determine the value of the properties. Second, Mr. Wallace's firm believes it will be able to obtain discounted brokerage fees on the sale of the properties. This could also result in a significant cost savings if the receivership moves to the monetization stage. Third, Mr. Wallace and his firm have extensive experience valuing and selling real estate assets and handling receiverships involving real estate issues.

## V. REQUEST FOR EXPEDITED CONSIDERATION

Time is of the essence to protect the assets at issue, and the SEC therefore respectfully requests that its motion be considered on an expedited basis.

## VI. REQUEST FOR RELIEF

For the foregoing reasons, the SEC respectfully requests that the Court grant the SEC's motion, enter the proposed order appointing a receiver, and grant the SEC such other or further relief as this Court may deem just, proper, and equitable.

Dated: September 26, 2022

Respectfully submitted,

*<u>/s/ Keefe M. Bernstein</u>*___________
Keefe M. Bernstein
Texas Bar No. 24006839
David B. Reece
Texas Bar No. 24002810
James E. Etri
Texas Bar No. 24002061
Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
(817) 900-2607 (KMB phone)
(817) 978-4927 (facsimile)
bernsteink@sec.gov

Counsel for Plaintiff
Securities and Exchange Commission

## CERTIFICATE OF CONFERENCE

I affirm that on September 25, 2022, I conferred with Khudabuksh Walji, Defendant Barton's counsel during the SEC's pre-suit investigation, and then Richard Roper, Defendant Barton's criminal counsel, about the relief requested in this Motion. Barton is currently incarcerated, and no counsel has appeared yet on behalf of any defendants in this case. However, based on these discussions it is my understanding that the Barton Defendants and Relief Defendants are currently opposed to the relief sought in this Motion.

*/s/ Keefe M. Bernstein*
Keefe M. Bernstein

## CERTIFICATE OF SERVICE

I affirm that on September 26, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court for the Northern District of Texas, Dallas Division, by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

I further certify that on the same day I caused the foregoing to be served via email (with the appendix via electronic file sharing) to the following.

Khudabuksh K. Walji, Esq.
Law Office of K. Walji, P.C.
The Atrium Building
10701 Corporate Drive, Suite 350
Stafford, Texas 77477
281-401-9672
k.walji@waljilaw.com

*Counsel for the Timothy Barton during the SEC's investigation*

Richard B. Roper
Holland and Knight
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
214-969-1210
richard.roper@hklaw.com

*Criminal counsel for Timothy Barton*

Eric Chartan
Bryan Cave Leighton Paisneer LLP
JP Morgan Chase Tower
2200 Ross Avenue, Suite 3300
Dallas, Texas 75201
214-721-8106
eric.chartan@bclplaw.com

*Counsel for Haoqiang (a/k/a Michael) Fu during the SEC's investigation*

Michael P. Heiskell
Johnson Vaughn & Heiskell
5601 Bridge Street, Suite 220
Fort Worth, Texas 76112
817-457-2999
mheiskell@johnson-vaughn-heiskell.com

*Counsel for Steven Wall during the SEC's investigation*

*/s/ Keefe M. Bernstein*
Keefe M. Bernstein

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TIMOTHY BARTON,<br>CARNEGIE DEVELOPMENT, LLC,<br>WALL007, LLC,<br>WALL009, LLC,<br>WALL010, LLC,<br>WALL011, LLC,<br>WALL012, LLC,<br>WALL016, LLC,<br>WALL017, LLC,<br>WALL018, LLC,<br>WALL019, LLC,<br>HAOQIANG FU (A/K/A MICHAEL FU),<br>STEPHEN T. WALL,<br><br>Defendants,<br><br>DJD LAND PARTNERS, LLC, and<br>LDG001, LLC,<br><br>Relief Defendants. | C.A. No.: 3:22-cv-2118-X<br><br>Jury Trial Demanded |

**ORDER APPOINTING RECEIVER**

**WHEREAS** this matter has come before this Court upon motion of Plaintiff Securities and Exchange Commission ("SEC") to appoint a receiver in the above-captioned action; and,

**WHEREAS** the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Defendants (defined below);

**WHEREAS** this Court has subject matter jurisdiction over this action and personal jurisdiction over the Receivership Defendants, and venue properly lies in this district.

**WHEREAS**, the Court finds that the SEC has brought this action to enforce the federal securities laws, in furtherance of the SEC's police and regulatory powers, and the relief sought by the SEC and provided in this Order is in the public interest by preserving the illicit proceeds of fraudulent conduct, penalizing past unlawful conduct and deterring future wrongdoing, and is not in furtherance of a pecuniary purpose, and therefore, the Court concludes that the entry of this Order is excepted from the automatic stay pursuant to 11 U.S.C. §362(b)(4).

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. This Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, Wall019, LLC, Carnegie Development, LLC, DJD Land Partners, LLC, LDG001, LLC, and any other entities that Defendant Timothy Barton directly or indirectly controls, including, but not limited to, the following Barton-controlled entities that received investor funds, real property interests purchased with investor funds, or own property interests that were improved with or otherwise have benefited from the use of investor funds: BM318 LLC; D4DS LLC; D4FR LLC; D4KL LLC; Enoch Investments LLC; FHC Acquisition LLC; Goldmark Hospitality LLC; JMJ Acquisitions LLC; JMJ Development LLC; JMJAV LLC; JMR100 LLC; Lajolla Construction Management LLC; Mansions Apartment Homes at Marine Creek LLC; MO 2999TC, LLC; Orchard Farms Village LLC; Villita Towers LLC; and 126 Villita LLC (collectively, "Receivership Defendants").

2. Until further Order of this Court, **DAVID WALLACE** of **TRIGILD, INC.** is hereby appointed to serve without bond as receiver (the "Receiver") for the estates of the Receivership Defendants.

## I. General Powers and Duties of Receiver

3. The Receiver shall have all powers, authorities, rights, and privileges heretofore possessed by the officers, directors, managers and general and limited partners of the entity Receivership Defendants under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and FED. R. CIV. P. 66.

4. The trustees, directors, officers, managers, employees, investment advisers, accountants, attorneys and other agents of the Receivership Defendants are hereby dismissed and the powers of any general partners, directors and/or managers are hereby suspended. Such persons and entities shall have no authority with respect to the Receivership Defendants' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operations of the Receivership Defendants and shall pursue and preserve all of their claims.

5. No person holding or claiming any position of any sort with any of the Receivership Defendants shall possess any authority to act by or on behalf of any of the Receivership Defendants.

6. Subject to the specific provisions in Sections II through XIIV below, the Receiver shall have the following general powers and duties:

A. To use reasonable efforts to determine the nature, location, and value of all property interests of the Receivership Defendants, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property" or, collectively, the "Receivership Estates");

B. To take custody, control, and possession of all Receivership Property and records relevant thereto from the Receivership Defendants; to sue for and collect, recover, receive, and take into possession from third parties all Receivership Property and records relevant thereto;

C. To manage, control, operate, and maintain the Receivership Estates and hold in his possession, custody, and control all Receivership Property, pending further Order of this Court;

D. To use Receivership Property for the benefit of the Receivership Estates, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E. To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees, and agents of the Receivership Defendants;

F. To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders, or auctioneers;

G. To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

H. The Receiver is authorized to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I. To bring such legal actions based in law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J. To pursue, resist, and defend all suits, actions, claims, and demands which may now be pending or which may be brought by or asserted against the Receivership Estates; and,

K. To take such other action as may be approved by this Court.

## II. Access to Information

7. The individual Receivership Defendants and the past and/or present officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants, and

employees of the entity Receivership Defendants, as well as those acting in their place, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendants and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts, and all other instruments and papers.

8. Within ten (10) days of the entry of this Order, the Receivership Defendants shall file with the Court and serve upon the Receiver and the SEC a sworn statement, listing: (a) the identity, location, and estimated value of all Receivership Property; (b) all employees (and job titles thereof), other personnel, attorneys, accountants, and any other agents or contractors of the Receivership Defendants; and, (c) the names, addresses, and amounts of claims of all known creditors of the Receivership Defendants.

9. Within twenty (20) days of the entry of this Order, the Receivership Defendants shall file with the Court and serve upon the Receiver and the SEC a sworn statement and accounting, with complete documentation, covering the period from January 1, 2017 to the present:

A. Of all Receivership Property, wherever located, held by or in the name of the Receivership Defendants, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains and/or exercised or exercises control, including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry, and other assets, stating the location of each; and (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage, or other financial institution held by, in the name of, or for the benefit of any of them, directly or indirectly, or over which any of them maintained or maintains and/or exercised or exercises any direct or indirect control, or in which any of them had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage, or other financial institution;

B. Identifying every account at every bank, brokerage, or other financial institution: (a) over which Receivership Defendants have signatory authority; and (b) opened by, in the name of, or for the benefit of, or used

by, the Receivership Defendants;

C. Identifying all credit, bank, charge, debit, or other deferred payment card issued to or used by each Receivership Defendant, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve (12) months;

D. Of all assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received;

E. Of all funds received by the Receivership Defendants, and each of them, in any way related, directly or indirectly, to the conduct alleged in the SEC's Complaint. The submission must clearly identify, among other things, all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds;

G. Of all expenditures exceeding $1,000 made by any of them, including those made on their behalf by any person or entity; and

H. Of all transfers of assets made by any of them.

10. Within thirty (30) days of the entry of this Order, the Receivership Defendants shall provide to the Receiver and the SEC copies of the Receivership Defendants' federal income tax returns for the years 2017 through 2021 with all relevant and necessary underlying documentation.

11. The individual Receivership Defendants and the entity Receivership Defendants' past and/or present officers, directors, agents, attorneys, managers, shareholders, employees, accountants, debtors, creditors, managers and general and limited partners, and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Defendants, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Defendants. In the event that the Receiver deems it necessary to require the appearance of the aforementioned persons or entities,

the Receiver shall make its discovery requests in accordance with the Federal Rules of Civil Procedure.

12. To issue subpoenas to compel testimony of persons or production of records, consistent with the Federal Rules of Civil Procedure and applicable Local Rules, except for the provisions of FED. R. CIV. P. 26(d)(1), concerning any subject matter within the powers and duties granted by this Order.

13. The Receivership Defendants are required to assist the Receiver in fulfilling his duties and obligations. As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver.

## III. <u>Access to Books, Records, and Accounts</u>

14. The Receiver is authorized to take immediate possession of all assets, bank accounts or other financial accounts, books and records, and all other documents or instruments relating to the Receivership Defendants. All persons and entities having control, custody, or possession of any Receivership Property are hereby directed to turn such property over to the Receiver.

15. The Receivership Defendants, as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receivership Defendants, and any persons receiving notice of this Order by personal service, email, facsimile transmission, or otherwise, having possession of the property, business, books, records, accounts, or assets of the Receivership Defendants are hereby directed to deliver the same to the Receiver, his agents, and/or employees.

16. All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody, or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, any of the Receivership Defendants that receive actual

notice of this Order by personal service, email, facsimile transmission, or otherwise shall:

A. Not liquidate, transfer, sell, convey, or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Defendants except upon instructions from the Receiver;

B. Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C. Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the SEC a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,

D. Cooperate expeditiously in providing information and transferring funds, assets, and accounts to the Receiver or at the direction of the Receiver.

## IV. Access to Real and Personal Property

17. The Receiver is authorized to take immediate possession of all personal property of the Receivership Defendants, wherever located, including but not limited to electronically stored information, computers, laptops, hard drives, external storage drives, and any other such memory, media or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, savings records and accounts, brokerage records and accounts, certificates of deposit, stocks, bonds, debentures, and other securities and investments, contracts, mortgages, furniture, office supplies, and equipment.

18. The Receiver is authorized to take immediate possession of all real property of the Receivership Defendants, wherever located, including but not limited to all ownership and leasehold interests and fixtures. Upon receiving actual notice of this Order by personal service, email, facsimile transmission or otherwise, all persons other than law enforcement officials acting within the course and scope of their official duties, are (without the express written permission of the Receiver) prohibited from: (a) entering such premises; (b) removing anything

from such premises; or, (c) destroying, concealing, or erasing anything on such premises.

19. In order to execute the express and implied terms of this Order, the Receiver is authorized to change door locks to the premises described above. The Receiver shall have exclusive control of the keys. The Receivership Defendants, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership.

20. The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the Receivership Defendants, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

21. Upon the request of the Receiver, the United States Marshal Service, in any judicial district, is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody, and control of, or identify the location of, any assets, records, or other materials belonging to the Receivership Estate.

## V. Notice to Third Parties

22. The Receiver shall promptly give notice of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers, and general and limited partners of the Receivership Defendants, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

23. All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any Receivership Defendant shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the Receivership Defendant had

received such payment.

24. In furtherance of his responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity, or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estates. All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the SEC.

25. The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations, or activities of any of the Receivership Defendants (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Defendants.

26. The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail. The Receivership Defendants shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of any individual Receivership Defendants, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mail box, depository, business or service, or mail courier or delivery service, hired, rented, or used by the Receivership Defendants. The Receivership Defendants shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository, or courier service.

27. Subject to payment for services provided, any entity furnishing water, electric,

telephone, sewage, garbage, or trash removal services to the Receivership Defendants shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

### VI. Injunction Against Interference with Receiver

28. The Receivership Defendants and all persons receiving notice of this Order by personal service, email, facsimile or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

A. Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Property; such prohibited actions include but are not limited to using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Property;

B. Hinder, obstruct, or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to concealing, destroying, or altering records or information;

C. Dissipate or otherwise diminish the value of any Receivership Property; such prohibited actions include but are not limited to releasing claims or disposing, transferring, exchanging, assigning, or in any way conveying any Receivership Property, enforcing judgments, assessments, or claims against any Receivership Property or any Receivership Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke, or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement, or other agreement executed by any Receivership Defendant or which otherwise affects any Receivership Property; or,

D. Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Receivership Estates.

29. The Receivership Defendants shall cooperate with and assist the Receiver in the performance of his duties.

30. The Receiver shall promptly notify the Court and SEC counsel of any failure or

apparent failure of any person or entity to comply in any way with the terms of this Order.

## VII. Stay of Litigation

31. As set forth in detail below, the following proceedings, excluding the instant proceeding and all police or regulatory actions and actions of the SEC related to the above-captioned enforcement action, are stayed until further Order of this Court:

> All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) any of the Receivership Defendants, including subsidiaries and partnerships; or, (d) any of the Receivership Defendants' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

32. The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

33. All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court. Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Defendants against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## VIII. Managing Assets

34. For each of the Receivership Estates, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

35. The Receiver's deposit account shall be entitled "Receiver's Account, Estate of

Barton Companies" together with the name of the action.

36. The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property.

37. Subject to Paragraph 38 immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estates, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

38. Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estates.

39. The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estates, including making legally required payments to creditors, employees, and agents of the Receivership Estates and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

40. The Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund," within the meaning of Section 468B of the Internal Revenue Code and of the regulations.

## IX. Investigate and Prosecute Claims

41. The Receiver is authorized, empowered, and directed to investigate, prosecute,

defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal, or foreign court or proceeding of any kind as may in his discretion, and in consultation with SEC counsel, be advisable or proper to recover and/or conserve Receivership Property.

42. Subject to his obligation to expend receivership funds in a reasonable and cost-effective manner, the Receiver is authorized, empowered, and directed to investigate the manner in which the financial and business affairs of the Receivership Defendants were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate; the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order. Where appropriate, the Receiver should provide prior notice to Counsel for the SEC before commencing investigations and/or actions.

43. The Receiver hereby holds, and is therefore empowered to waive, all privileges, including the attorney-client privilege, held by all entity Receivership Defendants.

44. The receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Estate.

## X. <u>Bankruptcy Filing</u>

45. Effective immediately, the Receiver, as sole and exclusive officer, director and managing member of Wall007, LLC, Wall009, LLC, Wall010, LLC, Wall011, LLC, Wall012, LLC, Wall016, LLC, Wall017, LLC, Wall018, LLC, and Wall019, LLC (collectively, "Wall Entities"), shall possess sole and exclusive authority and control over the Wall Entities, as debtors-in-possession, in their respective Chapter 11 cases titled *In re WALL007 LLC, et al.,* No. 22-41049

(Bankr. E.D. Tex.) (the "Bankruptcy Cases") pending in the U.S. Bankruptcy Court for the Eastern District of Texas (the "Bankruptcy Court"). The employment of any and all other officers, directors, managers or other employees of the Wall Entities is and are hereby terminated by the Court All such persons shall comply with the applicable provisions of this Order.

46. Within thirty (30) days of the entry of this Order, the Receiver shall report to this Court as to whether the Bankruptcy Cases should continue in Chapter 11, or be converted to Chapter 7, dismissed or suspended during the course of the receivership. The Receiver shall file the appropriate pleadings with the Court and the Bankruptcy Court effectuating this Order.

47. The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for other Receivership Defendants. If a Receivership Defendant is (or has been) placed in bankruptcy proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Estates as, a debtor in possession. In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. Pursuant to Paragraph 3 above, the Receiver is vested with management authority for all entity Receivership Defendants and may therefore file and manage a Chapter 11 petition.

48. All persons and entities, other than the Receiver, are barred from commencing any bankruptcy proceedings against any of the Receivership Defendants.

## XI. Liability of Receiver

49. Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

50. The Receiver and his agents, acting within scope of such agency ("Retained Personnel"), are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment,

or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel.

51. This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

52. In the event the Receiver decides to resign, the Receiver shall first give written notice to the SEC's counsel of record and the Court of its intention, and the resignation shall not be effective until the Court appoints a successor. The Receiver shall then follow such instructions as the Court may provide.

## XII. Recommendations and Reports

53. The Receiver is authorized, empowered, and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Liquidation Plan").

54. Within ninety (90) days of the entry date of this Order, the Receiver shall file the Liquidation Plan in the above-captioned action, with service copies to counsel of record.

55. Within thirty (30) days after the end of each calendar quarter, the Receiver shall file and serve a full report and accounting of each Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estates.

56. The Quarterly Status Report shall contain the following:

A. A summary of the operations of the Receiver;

B. The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C. A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D. A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E. A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F. A list of all known creditors with their addresses and the amounts of their claims;

G. The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H. The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

57. On the request of the SEC, the Receiver shall provide the SEC with any documentation that the SEC deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the SEC's mission.

## XIIV. Fees, Expenses, and Accountings

58. Subject to the paragraphs below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership. Further, prior Court approval is not required for payments of applicable federal, state, or local taxes.

59. Subject to the paragraph immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order. The Receiver shall not engage any Retained Personnel

without first obtaining an Order of the Court authorizing such engagement.

60. The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver. Such compensation shall require the prior approval of the Court.

61. Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estates (the "Quarterly Fee Applications"). At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the SEC a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by SEC staff.

62. All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership. At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

63. Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court. The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

64. Each Quarterly Fee Application shall:

A. Comply with the terms of the Billing Instructions agreed to by the Receiver; and,

B. Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were

incurred in the best interests of the Receivership Estate; and, (ii) with the exception of the Billing Instructions, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

65. At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by SEC staff, as well as the Receiver's final application for compensation and expense reimbursement.

**IT IS SO ORDERED, this _____ day of _____________, ________**

________________________________
**HONORABLE BRANTLEY STARR**
**UNITED STATES DISTRICT JUDGE**